FILED

2007 Apr-03  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **BRAD HILL, the Administrator of The Estate of Billy Michael Hill, Deceased,** } | |
| } | |
| **Plaintiff,** } | |
| } | **CASE NO. 3:06-CV-1763-RDP** |
| **v.** } | |
| } | |
| **RONNIE MAY, et al.,** } | |
| } | |
| **Defendants.** } | |

### MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the court is Defendants Ronnie May, Larry Lewis, George Sharp, Dale Holley, Gordon Harris, and Heath Holcomb's ("Defendants") Motion for Summary Judgment (Doc. # 3) filed July 14, 2006. On September 5, 2006, this court granted Dr. George Luckey's Motion for Summary Judgment and Motion to Exclude the Testimony of Simon N. Whitney, M.D. (Plaintiff's expert).[1] On September 6, 2006, the court, in light of its ruling the day before, mooted Defendants' Motion to Strike Plaintiff's "Statement of Additional Facts." On September 15, 2006, the court denied Plaintiff's motion to alter, amend, or vacate this court's prior order granting summary judgment to Defendant George Luckey.

On October 11, 2006, Defendants filed a supplement to their brief in support of their motion for summary judgment. (Doc. # 5). In that submission, Defendants cited *Williams v. Limestone*

---

[1]In the court's September 5, 2006 order dismissing the case against Dr. George Luckey, the court also severed Plaintiff's claims against these Defendants, transferred them to a new case, and closed the case against Dr. George Luckey. *See Hill v. May*, 3:03-CV-0745-RDP (N.D. Ala. Sept. 6, 2006). This was done by agreement of the parties so that Luckey could benefit from a final judgment in that case and Plaintiff could proceed with an immediate appeal. Final judgment was entered but Plaintiff opted not to file an appeal in that case.

*County, Ala.*, 198 F. App'x 893 (11th Cir. Oct. 6, 2006) as controlling of the remaining issues in this case.  The court in its December 11, 2006 order asked the parties to more fully brief the issues set forth in Defendants' supplement to their brief.  (Doc. # 22).  These issues have now been fully briefed by the parties and the summary judgment record came under submission on January 8, 2007.

After reviewing *Williams*, the court agrees with Defendants that it is now the law of this circuit that prison officials and employees are entitled to rely on the medical judgments made by medical professionals responsible for prisoner care.  Therefore, Defendants are entitled to qualified immunity on Plaintiff's Eighth and Fourteenth Amendment claims, Defendants are entitled to summary judgment on Plaintiff's excessive force claims as Plaintiff cannot present substantial evidence on that issue, and Sheriff Ronnie May is entitled to summary judgment on Plaintiff's § 1983 claims for his supervisory role, as Plaintiff has not shown a causal link between his acts or omissions and the alleged constitutional deprivation.  In summary, for the reasons set forth more fully below, the court finds that Defendants are entitled to summary judgment on each of Plaintiff's claims and that all claims against Defendants are due to be dismissed.

## II.    STATEMENT OF FACTS

Plaintiff is the administrator of the estate of his father, Billy Michael Hill (hereinafter "Mr. Hill").  (Doc. # 21 ¶ 3).  Defendants are several employees of the Colbert County Jail System, including Defendant George Luckey, M.D. ("Luckey"), a doctor who provided medical services for the Colbert County Jail, and against whom all claims have been dismissed pursuant to this court's previous order.  (Doc. # 1; Doc. # 21 ¶¶ 4–11).

Mr. Hill had a history of mental illness.  (Doc. # 6 ¶ I-1).  On April 10, 2001, Mr. Hill was arrested by the Colbert County Sheriff's Department and placed in the Colbert County Jail for the

felony murder of John Simon Hurst ("Hurst").  (Doc. # 21 ¶ 15, Doc. # 6 ¶ I-1).  Immediately prior to his arrest, Mr. Hill had been involved in a violent physical altercation with Jack Harrison, a neighbor, and Curtis Harrison, a fireman and paramedic on the scene and Jack Harrison's brother, which ended only after a sheriff's deputy and Alabama State Forestry Commission Officer reached the scene, broke up the fight, and struggled to subdue and arrest Mr. Hill.  (Doc. # 6 ¶¶ I-27–I-52). At the time of his arrest, Mr. Hill had some injuries, which included a dog bite injury to his right ear caused by the Hurst's dog, several wounds inflicted by Ms. Denise Hurst, the alleged victim's daughter, and numerous wounds as a result of the fight with Jack Harrison.  (Doc. # 6 ¶¶ I-1, I-34, I-57–I-58; Doc. # 7 Ex. B ¶¶ 12–13; Doc. # 7 Ex. D).

During the inventory search of Mr. Hill's residence, two prescription drugs were found. (Doc. # 6 ¶ I-2).  These prescriptions were either not current, not prescribed to Mr. Hill, or the medication was expired.  (Doc. # 20 Ex. Z ¶¶ 4–6).  Sheriff Ronnie May ("Sheriff May") instructed a deputy to begin contacting the doctors listed on his medication bottles to determine how recently they had seen him, what they were treating him for, what medications he was supposed to be taking, and when the last time a prescription was filled, but the doctors were unwilling to disclose any information.  (Doc. # 6 ¶ I-66; Doc. # 8 Ex. E 52).  He also instructed a deputy to find out if Mr. Hill was a patient at Riverbend Mental Health Center, but the hospital's privacy rules prevented it from disclosing that information.  (Doc. # 6 ¶ I-67; Doc. # 8 Ex. E 54).

Mr. Hill violently struggled with officers during his arrest, during transportation to Colbert County Jail, and once he was at the jail during processing.  (Doc. # 6 ¶¶ I-53–I-55, I-60–I-61; Doc. # 7 Ex. B ¶ 16).  Because of Mr. Hill's continued aggressive and hostile behavior, Sheriff May ordered that he be placed in leg restraints and a waist chain with handcuffs, as he was concerned that

Mr. Hill would otherwise be able to harm himself.  (Doc. # 6 ¶ I-63–I-65, I-68; Doc. # 8 Ex. E 79–80, 82, 92–93).  Per Sheriff May's instructions, Mr. Hill was placed on suicide watch at 11:15 p.m. on April 10, 2001, and was checked on every fifteen minutes thereafter.  (Doc. # 6 ¶ I-69; Doc. # 8 Ex. F).  For the remainder of April 10, 2001, Mr. Hill sat on the bench in his cell singing.  (Doc. # 6 ¶ I-69; Doc. # 8 Ex. F).

During the early morning hours of April 11, 2001, Mr. Hill lay on the floor of his cell kicking the door of the cell, then lay on the floor and sang.  (Doc. # 6 ¶ I-70; Doc. # 8 Ex. F).  Around 4:40 a.m., Mr. Hill began periodically standing up and sitting in his cell.  (Doc. # 6 ¶ I-71; Doc. # 8 Ex. F).  On the morning of April 11, 2001, Sheriff May instructed the Jail Administrator Larry Lewis ("Lewis") to check on Mr. Hill at least twice a day, in addition to the fifteen minute interval checks by jail officers, due to his aggressive and hostile behavior.  (Doc. # 6 ¶ I-72; Doc. # 8 Ex. E 50–52, 59).  Sheriff May further informed Lewis that Mr. Hill would be going to the hospital that morning to have a blood sample drawn and to be examined.  (Doc. # 6 ¶ I-75; Doc. # 8 Ex. E 51).

Sergeant George Sharp ("Sharp") was called to the jail to transport Mr. Hill to the Helen Keller Hospital emergency room so that he could be checked by the medical staff, and Officer Dale Holley ("Holley") was asked to go as well.  (Doc. # 6 ¶ I-76; Doc. # 9 Ex. G 13–14; Doc. # 9 Ex. H 21).  Sharp and Holley went to Mr. Hill's cell to remove him.  (Doc. # 6 ¶ I-77; Doc. # 9 Ex. G. 14–15).  Holley observed that Mr. Hill's handcuffs were locked to make sure that they would not tighten, and they were not closed beyond the point that an officer could get his finger in between the handcuffs and Mr. Hill's hands. (Doc. # 6 ¶ I-78; Doc. # 9 Ex. H 6–14).  Initially, Mr. Hill told them to leave him alone, and when they got to the car, he refused to get in the car.  (Doc. # 6 ¶ I-79; Doc. # 9 Ex. G 15–16).  Sharp then put his hand on the back of Mr. Hill's head, told him to watch his head

4

and to get in the car, and, after pushing back once more, Mr. Hill got into the car without further incident.  (Doc. # 6 ¶ I-79; Doc. # 9 Ex. G 16).

Captain Frank Brians ("Brians") met Sharp and Holley at the emergency room, whereupon Mr. Hill began cursing and shouting loudly, and was uncooperative.  (Doc. # 6 ¶ I-80–I-81; Doc. # 9 Ex. G. 17–19).  When the medical staff entered the emergency room, Mr. Hill tried to resist and fight them.  (Doc. # 6 ¶ I-82; Doc. # 9 Ex. G 18).  At one point, the officers had to handcuff Mr. Hill to the bed so the medical staff could do a blood test and take his blood pressure, and, ultimately, it took three officers and a paramedic to restrain him.  (Doc. # 6 ¶ I-83; Doc. # 9 Ex. G. 18–19).  While at the hospital, Mr. Hill was given a medical examination, treated for a dog bite, and given a tetanus shot and drug screen.  (Doc. # 6 ¶ I-5).  The physician at Helen Keller Hospital discharged Mr. Hill to the Colbert County Jail.  (*Id*.).

During the ride back to the jail, Sharp attempted to talk with Mr. Hill to try to calm him down.  (Doc. # 6 ¶ I-84; Doc. # 9 Ex. G 20).  When they returned to the jail, Mr. Hill got out of the car, was escorted back to his cell without any problems, and sat down on his bunk around 9:40 a.m.  (Doc. # 6 ¶ I-86; Doc. # 9 Ex. G 23–24, 27).  Thereafter, he laid in his cell for about an hour, refused his lunch, then alternated standing, sitting, and laying in his cell until about 3:00 p.m.  (Doc. # 6 ¶ I-86; Doc. # 8 Ex. F).  Sheriff May instructed Lewis to continue monitoring Mr. Hill and to keep him apprised of whether Mr. Hill was eating and/or drinking and whether Mr. Hill's aggressive demeanor began to diminish.  (Doc. # 6 ¶ I-87; Doc. # 8 Ex. E 65).  Additionally, Sheriff May's first contact with Mr. Hill's family was a telephone conversation on April 11, 2001, during which an unidentified family member wanted to know why Mr. Hill was in jail, what he had done, how they could get him out of jail, and if there was a bond set.  (Doc. # 6 ¶ I-88; Doc. # 8 Ex. E 114).

5

Upon his arrival to work to start the second shift on April 11, Officer Gordon Harris ("Harris") received a phone call from Lewis which informed him of Mr. Hill's uncooperative behavior and also warned him to have another guard present before opening Mr. Hill's cell.  (Doc. # 6 ¶ I-90; Doc. # 9 Ex. I 21–22).  Shortly thereafter, Harris checked on Mr. Hill and observed him standing up in the cell looking out into the hall.  (Doc. # 6 ¶ I-90; Doc. # 9 Ex. I 22).  Mr. Hill moved around in the cell during Harris's shift. (Doc. # 6 ¶ I-91; Doc. # 9 Ex. I 25).  At 5:00 p.m., 5:15 p.m., and 5:30 p.m., Harris, accompanied by a trustee inmate, attempted to get Mr. Hill to eat, but he would not respond.  (Doc. # 6 ¶ I-92; Doc. # 8 Ex. F).  At 6:00 p.m., Harris asked Mr. Hill if he needed to use the restroom, but again he would not speak.  (Doc. # 6 ¶ I-93; Doc. # 8 Ex. F).

At 5:00 a.m. on April 12, 2001, Officer W.L. Overton ("Overton") asked Mr. Hill if he wanted to eat, but again he did not answer.  (Doc. # 6 ¶ I-94; Doc. # 8 Ex. F).  Overton again offered Mr. Hill fluids at 7:16 a.m. and 8:46 a.m and offered him lunch at 10:46.  (Doc. # 6 ¶ I-95–I-96; Doc. # 8 Ex. F).  Mr. Hill refused each of those offers, and Overton reported that to the shift sergeant. (*Id.*).

On April 12, 2001, Sheriff May spoke to Mr. Hill's family a second time when four of Hill's family members came to Sheriff May's office.  (Doc. # 6 ¶ I-98; Doc. # 8 Ex. E 114).  Sheriff May explained to them what Mr. Hill had allegedly done, what charges were anticipated, that no bond had been set at that time, and that Mr. Hill was being unresponsive and was refusing food and drink. (Doc. # 6 ¶ I-99; Doc. # 8 Ex. E 115).  Additionally, he asked them about the medication bottles that had been found at Mr. Hill's home, but they could not tell him what medications, if any, Mr. Hill should have been taking, which hospital he had been going to, or when the last time was that he had been there.  (Doc. # 6 ¶ I-99; Doc. # 8 Ex. E. 115–16; Doc. # 9 Ex. J 266).  Sheriff May allowed the

6

family to visit Mr. Hill at 12:08 p.m., so that they could encourage him to talk to the jail officers and let them know if he was taking medication and/or seeing a doctor, asking them to return to his office to let him know how the visit went.  (Doc. # 6 ¶¶ I-101–I-103; Doc. # 8 Ex. E 118; Doc. # 8 Ex. F; Doc. # 10 Ex. R).  Upon their return to his office, the family informed Sheriff May that Mr. Hill would not speak to them.  (Doc. # 6 ¶ I-104; Doc. # 8 Ex. E 120).  Sheriff May told the family that Mr. Hill had seen a doctor at the Helen Keller Hospital and asked them to let him know if they found out anything about his medical history. (Doc. # 6 ¶ I-105; Doc. # 8 Ex. E 120)

At 2:01 p.m., Mr. Hill again refused fluids, and at 5:00 p.m., 5:15 p.m., 5:30 p.m., 5:45 p.m., 8:00 p.m., 8:15 p.m., and 8:30 p.m. Harris attempted to coerce him to eat or drink something, but he was either unresponsive or stated "no." (Doc. # 6 ¶ I-106–I-108; Doc. # 8 Ex. F; Doc. # 10 Ex. K).

On April 13, 2001, at 5:00 a.m. and 6:00 a.m., Overton called Mr. Hill's name and asked him if wanted to eat.  (Doc. # 6 ¶¶ I-109–I-110; Doc. # 8 Ex. F).  Overton reported to Sharp that Mr. Hill had not said anything during his shift.  (Doc. # 6 ¶ I-111; Doc. # 8 Ex. F).  Sharp investigated, and upon his arrival at Mr. Hill's cell, Sharp found Mr. Hill lying in the floor of his cell, with his food trays in the cell untouched, and it appeared that Mr. Hill had urinated on himself.  (Doc. # 6 ¶ I-112; Doc. # 9 Ex. G 27–28).

Dr. George Luckey ("Dr. Luckey" or "Luckey"), who provided medical services to the Colbert County Jail inmates under contract, examined Mr. Hill on April 13, 2001.  (Doc. # 10 Ex. L; Doc. # 8 Ex. F).  Dr. Luckey was accompanied by three or four jailers or deputies during Mr. Hill's examination in his cell.  (Doc. # 6 ¶ I-7).  Upon entering Mr. Hill's cell, Dr. Luckey smelled urine and noticed yellow stains on Mr. Hill's underwear.  (*Id*. ¶ I-8).  Mr. Hill's shackles were off

during the examination.  (*Id.* ¶ I-9).  Dr. Luckey examined Mr. Hill's physical appearance and conduct, as well as more closely examining some of his vital signs and conducting a neurological exam.  (*Id*. at ¶¶ I-9–I-10).  Dr. Luckey requested that Mr. Hill be cleaned and given fluids, and Mr. Hill was able to stand up and walk to the shower.  (Doc. # 6 ¶ I-113–I-115; Doc. # 9 Ex. G 28–30).  One of the officers asked Dr. Luckey if Gatorade would be good for Mr. Hill, and Dr. Luckey responded that it would be "great" if they had any.  (Doc. # 6 ¶¶ I-116–I-117; Doc. # Ex. G 28, 42).  Sharp and Holley went to a local food store and bought the Gatorade, paying for it with their own money, and went to the jail's kitchen and made a sandwich for Mr. Hill.  (*Id.*).  Mr. Hill ate about half of the sandwich and drank about sixteen ounces of Gatorade, and consumed about eight ounces of water in the presence of Dr. Luckey and some of the officers.  (Doc. # 6 ¶ I-118; Doc. # 9 Ex. E 37; Doc. # 10 Ex. L).  Dr. Luckey spent a total of one and a half hours with Mr. Hill on April 13, 2001, and directed the jail personnel to contact him if there were any other problems with Mr. Hill.  (Doc. # 6 ¶¶ I-14, I-16).

Before leaving the jail, Dr. Luckey filled out a medical request sheet based on his examination of Mr. Hill.  (*Id*. at ¶ I-119; Doc. #80, Ex. L).  Dr. Luckey provided a five-step plan of care after seeing Mr. Hill, which he outlined in the jail's medical request form.  Step one was to hydrate, clean, and nourish Mr. Hill.  Step two was to observe Mr. Hill for a return of some lucidity.  Step three was to reevaluate Mr. Hill's mental status and degree of emotional dysfunction.  Step four was to offer Mr. Hill one can of Ensure six times a day.  Step five was to encourage Mr. Hill to drink plenty of fluids. (Doc. # 6 ¶ I-120; Doc. # 10 Ex. L).

Mr. Hill's family visited him again at 12:01 p.m on April 13, 2001.  (Doc. # 6 ¶ I-121; Doc. # 8 Ex. F; Doc. # 10 Ex. R).  At 1:16 p.m. and 2:31 p.m. Mr. Hill was offered fluids but refused

them, and at 4:00 p.m. and 11:00 p.m. Harris asked him if he wanted water but he answered "no." (Doc. # 6 ¶¶ I-122–I-123; Doc. # 8 Ex. F).  At approximately 6:35 p.m., Harris received a call from a man who stated that he was Mr. Hill's brother-in-law.  Harris asked the man if Mr. Hill was sick or on any kind of medication, but the man would not give him any information.  (Doc. # 6 ¶¶ I-124–I-125; Doc. # 10 Ex. I 62–63; Doc. # 10 Ex. L; Doc. # 8 Ex. F).

On April 14, 2001, at 7:31 a.m., 9:01 a.m., and 10:16 a.m., Mr. Hill was offered fluids and refused them, and he then refused lunch at 11:01 a.m.  (Doc. # 6 ¶¶ I-126–I-127; Doc. # 8 Ex. F). Mr. Hill was offered Ensure nutritional drinks six or seven times during Officer Heath Holcomb's ("Holcomb") shift, and he refused each time stating "no."  (Doc. # 6 ¶ I-127; Doc. # 10 Ex. M).  At 12:31 p.m., 12:46 p.m., 1:01 p.m, 1:16 p.m., 1:21 p.m., 1:46 p.m., 2:01 p.m., 2:16 p.m., 2:31 p.m., and 2:46 p.m., Mr. Hill was offered fluids and refused, and at 5:00 p.m., Mr. Hill was offered chicken nuggets and water and refused these as well.  (Doc. # 6 ¶¶ I-128–I-129; Doc. # 8 Ex. F).  At 6:15 p.m., jail personnel asked Mr. Hill was asked if he wanted anything, but he was unresponsive, and at 7:45 p.m., Mr. Hill was once again offered Ensure.  (Doc. # 6 ¶ I-130; Doc. # 8 Ex. F).

Sometime on April 14, 2001, a member of the jail staff called Dr. Luckey's answering service regarding Mr. Hill.  (Doc. # 6 ¶ I-20).  Dr. Luckey responded to a page from his answering service regarding Mr. Hill.  (*Id.*).  Dr. Luckey instructed the jailers to continue hydrating Mr. Hill and, if his condition did not improve, at some point they were to send him to the emergency room at Helen Keller Hospital.  (*Id.*).

The morning of April 15, 2001, the jailer on duty called paramedics to have Mr. Hill transported to the emergency room at Helen Keller Hospital at 8:05 a.m.  (*Id.* ¶ I-21; Doc. # 10 Ex. N).  Dr. Luckey consulted that morning with the emergency room doctor regarding Mr. Hill's

9

condition. (Doc. # 6 ¶ I-21). Dr. Luckey also called Plaintiff and attempted to get more information about what medication his father was taking. (*Id.*). He then called someone at the Colbert County Jail to get permission for Plaintiff to go to his father's house to retrieve any medication. (*Id.* ¶ I-22). At approximately 11:00 p.m., on April 15, 2001, Mr. Hill died. (*Id.* ¶ I-23). The autopsy was performed by Dr. J. R. Glenn, a Deputy Medical Examiner, who concluded that Mr. Hill died from multiple bilateral pulmonary emboli secondary to thrombosis of cephalic vein and its tributaries due to blunt force trauma to the right upper extremity, but the precise manner of Mr. Hill's death was undetermined. (*Id.* ¶ I-24; Doc. # 13 Ex. U; Doc. # 13 Ex. V 15, 19). In more general terms, the autopsy shows that either something hit Mr. Hill's arm or he fell against something which caused a blood clot, which traveled to Mr. Hill's lungs and caused his death. (Doc. # 6 ¶¶ I-142; Doc. # 13 Ex. V 17–18). The forensic pathologist with the Alabama Department of Forensics who reviewed the autopsy file, Dr. Lauridson, testified that all the injuries documented on the autopsy report are survivable except the pulmonary embolus, and that it is possible that some of the injuries Mr. Hill had sustained that were shown in the autopsy photographs were self-inflicted. (Doc. # 6 ¶ I-143; Doc. # 13 Ex. V 8, 11–12, 62, 66; Docs. # 11 & 12 Ex. S). In fact, Mr. Hill had been observed using his shoulders to bang against the cell door during his incarceration, and Plaintiff (Mr. Hill's son) testified that Mr. Hill's injuries at the time of his arrest were the same as those Plaintiff observed on Mr. Hill each day at the jail. (Doc. # 6 ¶¶ I-139, I-146; Doc. # 9 Ex. J at 208–209; Doc. # 7 Ex. D; Doc. # 14 Ex. X. *Compare* Doc. # 7 Ex. D *with* Docs. # 11 & 12 Ex. S). At least one officer observed that extensive blunt force trauma, including a bruise to Mr. Hill's right upper arm, was present at the time of Hill's arrest. (Doc. # 7 Ex. B ¶¶ 10–11). Dr. Lauridson noted that it is not at all uncommon for a pulmonary embolism to be discovered for the first time during an autopsy, and

both parties' experts opined that even if a patient were to be diagnosed with a pulmonary embolism in a hospital, that does not mean that the patient will survive.  (*Id*. ¶¶ I-24–I-25; Doc. # 13 Ex. V 26–27).

In his position as Sheriff, Ronnie May is responsible for promulgating the policies and procedures for the Colbert County, Alabama Jail, and he had set into place policies and procedures for the Colbert County Jail at the time of Mr. Hill's incarceration.  (Doc. # 6 ¶¶ I-148–I-149; Doc. # 8 Ex. E 16; Doc. # 10 Ex. Q ¶ 3).  Jail officers at the Colbert County Jail are instructed to read the policy manual and are also required to attend jail administrative school and receive on the job training from experienced officers.  (Doc. # 6 ¶ I-150; Doc. # 8 Ex. E 96).  Any of Sheriff May's employees who violate Sheriff May's policies and procedures are subject to disciplinary action, with the first course of such action being a verbal warning, then a written warning, then a written reprimand; if the conduct continues, the Sheriff may use his discretion to determine whether the employee will be subjected to counseling, suspension, or termination, and a severe offense could result in immediate termination. (Doc. # 6 ¶ I-151; Doc. # 8 Ex. E 34–36).  At the time of Mr. Hill's incarceration, the pertinent policy and procedures in place included:

    a.       Restraints were to be used for restraint only and not for punishment.

    b.       Access to appropriate health care services were to be provided to all inmates in the jail.

    c.       In addition, jail staff members were to take no deliberate action either to block, deny, or delay an inmates' access to health care services.

(Doc. # 6 ¶ I-152; Doc. # 14 Ex. Y 48, 115–16).  Sheriff May's policy also required that, prior to the use of force, all reasonable attempts must be made to identify and utilize alternative means to deal with the situation at hand and that any type of force should be used only to the degree necessary

under the facts and circumstances of the particular situation.  (Doc. # 6 ¶ I-154; Doc. # 14 Ex. Y 58).

Any use of force must be discontinued as soon as the inmate is subdued, restrained, or under control, and force must never be used against an inmate as a form of punishment.  (Doc. # 6 ¶ I-154; Doc. # 14 Ex. Y 58).  Following any use of force, a detailed written report must be completed by each officer involved either using force or in viewing the use of force. (Doc. # 6 ¶ I-154; Doc. # 14 Ex. Y 58).  It is a violation of Sheriff May's policies and procedures to use excessive force on an inmate. (Doc. # 6 ¶ I-155; Doc. # 14 Ex. Y 58).  Each Defendant denies ever using any degree of force against Mr. Hill, with the possible exception of putting him into the restraints mentioned above. (Doc. # 6 ¶¶ I-157–I-166; Doc. # 9 Ex. G 11–13, 25–26, 33, 39–40; Doc. # 9 Ex. I 10, 52; Doc. # 10 Ex. P 5–6, 18, 20; Doc. # 9 Ex. H 10–11, 21, 34–35, 43, 47, 50).

Additionally, departmental policy allowed physical restraints to be used to control an inmate, for the prevention of an escape, to prevent an inmate from harming himself, or to prevent the inmate from assaulting another person.  (Doc. # 6 ¶ I-155; Doc. # 14 Ex. Y 58).  All Sheriff May's employees were aware of his policies and procedures at the time of Mr. Hill's incarceration.  (Doc. # 6 ¶ I-156; Doc. # 10 Ex. Q ¶ 6).

In addition to the facts outlined above, to which both parties have stipulated, Plaintiff alleges additional disputed facts with respect to the jail officer Defendants.  Plaintiff asserts that Mr. Hill sustained the injuries (either inflicted by Defendants or that should have been promptly treated by Defendants) described in his autopsy while in the care, custody and control of the Colbert County Sheriff's Department (*i.e.*, Defendants).  (Doc. # 6 ¶¶ II-1, II-18).  According to Plaintiff, Dr. Luckey did not treat the dog bite wound on Mr. Hill's ear during his visit with Mr. Hill.  (Doc. # 6 ¶ II-3).  Furthermore, Plaintiff asserts that it was inappropriate for Dr. Luckey to not have referred Mr. Hill

12

for a mental evaluation, and that this was a violation of the Colbert County Sheriff's Department's Policy and Procedure Manual.  (*Id.* ¶ II-4).  Plaintiff generally alleges that the health care section of the Colbert County Sheriff's Department's Policy and Procedure Manual states that, absent permission by an inmate, the Department will not treat non-life threatening injuries, and asserts that this policy is a violation of clearly established constitutional law in the Eleventh Circuit.  (*Id.* ¶ II-5; Doc. # 20 Exs. AA & BB).

Plaintiff further alleges that Defendants: (1) failed to give Mr. Hill food and water for four days; (2) failed to treat his serious medical needs; (3) failed to give him his prescription medication, which they had in their possession; (4) had both the authority and the constitutional duty to treat him humanely and to transport him to the hospital at first sign of his condition worsening, but did not; and (5) had actual knowledge of Mr. Hill's condition, but did nothing to help him over a period of four days.  Plaintiff asserts that these actions constituted deliberate indifference to Mr. Hill's constitutional rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments and to his Fourteenth Amendment right to due process, and violated Policy and Procedure Manual of the Department.  (*Id.* ¶¶ II-6–II-8, II-10–I-11, I-16).  As to Sheriff May specifically, Plaintiff charges that he had actual knowledge of the deliberate indifference exhibited by his personnel on the numerous occasions that they failed to treat Mr. Hill's serious medical needs and that Sheriff May has a non-delegable duty to ensure that prisoners receive proper treatment.  (*Id.* ¶ II-11).  Finally, Plaintiff states that Dr. Luckey filled out a Colbert County Jail medical request form regarding his examination of Mr. Hill and that Dr. Luckey noted on this form that Mr. Hill showed positive signs of a major mental illness; however, Plaintiff asserts that neither Dr. Luckey nor Defendants did anything to treat Mr. Hill for his mental illness.  (*Id.* ¶ II-12).

13

III.     STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a

14

directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

15

IV.    ANALYSIS

A.    **Plaintiff Has Presented No Evidence of Defendants' Alleged Use of Excessive Force.**

Plaintiff asserts that because Mr. Hill "looked different" in the pictures in the autopsy report than he did when he was arrested, one of the Defendants "must have" abused him or allowed him to abuse himself.  (Doc. # 16 ¶¶ 1, 18).  However, Plaintiff has not presented the court with any evidence showing that Mr. Hill sustained any injuries after his arrest.  In fact, Mr. Hill had been observed using his shoulders to bang against the cell door during his incarceration, and Plaintiff (Mr. Hill's son) testified that Mr. Hill's injuries at the time of his arrest were the same as those Plaintiff observed on Mr. Hill each day at the jail.  (Doc. # 6 ¶¶ I-139, I-146; Doc. # 9 Ex. J at 208–209; Doc. # 7 Ex. D; Doc. # 14 Ex. X; *Compare* Doc. # 7 Ex. D *with* Docs. # 11 & 12 Ex. S).  At least one officer observed that extensive blunt force trauma, including a bruise to Hill's right upper arm, was present at the time of Mr. Hill's arrest.  (Doc. # 7 Ex. B ¶¶ 10–11).  After comparing the photographs, the court must conclude, that Mr. Hill's injuries at the time of his arrest appear to be the same as those in the autopsy photographs. (*Compare* Doc. # 7 Ex. D *with* Docs. # 11 & 12 Ex. S).  But, even if there were evidence of additional injury contained in the sets of photographs or otherwise, such injury cannot be attributed to Defendants' actions, as there is no evidence that Defendants unlawfully[2] caused any injuries but there is undisputed evidence of other potential sources of injury to Mr. Hill.  For example, there is evidence that Mr. Hill used his shoulders to bang against his cell door during his incarceration and that he was involved in several physical altercations

---

[2]There is evidence that Defendants were required to use a degree of force when Mr. Hill was arrested and jailed.  But there is nothing in the record to suggest that the use of such force was improper.

16

resulting in numerous injuries to him before he was taken to jail.  (Doc. # 14 Ex. X; Doc. # 6 ¶¶ I-27–I-52).  The burden is on Plaintiff to show how the injuries occurred, and he cannot satisfy this burden with unsupported allegations and unsubstantiated theories.[3]

Further, Plaintiff argues both that the use of restraints on Mr. Hill was excessive force and that such restraints were used for an impermissible purpose.  The court finds each of these arguments to be without merit.  In the Parties' Joint Stipulation of Facts, Plaintiff agreed that Mr. Hill was restrained as a suicide precaution and to protect others from his actions.  (Doc. # 6).  In such a case, restraint was for a permissible purpose under the applicable law.  *Campbell v. Sikes*, 169 F.3d 1353, 1376–78 (11th Cir. 1999); *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991).   Therefore, the court finds that Plaintiff's claim for excessive force as a result of Defendants' use of restraints fails as a matter of law.

### B.    Defendants Were Not Deliberately Indifferent to Mr. Hill's Medical Needs.

Plaintiff also asserts that Defendants engaged in deliberate indifference toward Mr. Hill's medical needs, and this violated Mr. Hill's constitutional rights to due process under the Fourteenth Amendment.  The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. "After incarceration, only the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted)).  In *Estelle v. Gamble*, the Supreme Court held that a prison official's "deliberate

---

[3]For these same reasons, Plaintiff's argument that Mr. Hill did not have these injuries when he was seen at the hospital on April 10, 2001, is without merit.  There is no evidence in the record to support that argument.  Plaintiff has not presented any hospital records in this case.  There simply is no Rule 56 evidence to support Plaintiff's contentions.

indifference to [the] serious medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." 429 U.S. at 104 (internal quotation marks and citation omitted); *see Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999). Thus, deprivation or denial of adequate medical treatment to prisoners or pre-trial detainees in state custody has been found to violate the Eighth and the Fourteenth Amendments, respectively.[4] *See Farrow v. West*, 320 F.3d 1235, 1242–43 (11th Cir. 2003). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the [Constitution].'" *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted); *see Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105–06.

To prevail on this claim, Plaintiff "must satisfy both an objective and a subjective inquiry. First, the plaintiff must prove an objectively serious medical need. Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal quotation marks omitted) (quoting *Farrow*, 320 F.3d at 1243 (11th Cir. 2003)). Both parties agree that Mr. Hill had medical needs, although they disagree about the severity of those needs and the extent to which they could be discerned to be life-threatening.

---

[4]As Mr. Hill was a pre-trial detainee, his cruel and unusual punishment claims properly sound in the Fourteenth Amendment right to due process of law rather than in the Eighth Amendment. *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3; *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 n. 6 (11th Cir. 1997) (comparing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, (1979) (due process violation), with *Estelle v. Gamble*, 429 U.S. 97,(1976) (Eighth Amendment violation)). "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001) (en banc).

(Doc. # 6 ¶¶ I-5, I-8–I-10, I-20–I-21, I-23–I-25, I-132, I-140–I-146).  The court will assume that Mr. Hill had serious medical needs for the purpose of evaluating his claim of Defendants' deliberate indifference, and evaluate the subjective element of the claim.

To satisfy the subjective element of deliberate indifference to Mr. Hill's serious medical needs, Plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."  *Brown*, 387 F.3d at 1351; *see also Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) (noting, after *Farmer v. Brennan*, 511 U.S. 825, (1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (same).  Plaintiff must complete a two-step process to demonstrate the level of subjective knowledge necessary to impute to a defendant a sufficiently blameworthy state of mind for liability.  That defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [ ] must also draw the inference."  *Farmer*, 511 U.S. at 837.

Applying this test here, the court concludes that Plaintiff has not offered any evidence supporting a contention that Defendants were aware of facts from which an inference could be drawn that a substantial risk of serious  harm existed and drew such an inference.  The parties and experts all agree that there were no immediately observable symptoms of the pulmonary emboli, the condition that ultimately claimed Mr. Hill's life.  (Doc. # 10 Ex. Q. 105; Doc. # 6 ¶¶ I-25; Doc. # 7 Ex. D 26).  Therefore, the court finds on this record that Defendants did not possess the necessary subjective intent to be held liable.  Even assuming an objectively serious medical need existed, there is no evidence that the Defendants were subjectively deliberately indifferent.  Mr. Hill was given medical attention three times during his five day incarceration, and all medical orders were followed.

Prison officials and employees, such as Defendants, are entitled to rely on the medical judgment of medical professionals who treat inmates in their care (here, Dr. Luckey and the medical staff at Helen Keller Hospital). *Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."); *see also Washington v. Harper*, 494 U.S. 210, 231 (1990) (indicating the preference for relying on medical professionals as to medical judgments for inmates); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (granting summary judgment for prison superintendent where he had no medical training but instead relied on the recommendation of the medical director); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions . . . . The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (stating that prison officials may not "substitute their judgments for a medical professional's prescription"); *Jinks v. McCauley*, 163 F.3d 598 (4th Cir. 1998) ("[J]ail officials are generally entitled to rely on a physician's decision regarding care for a prisoner."); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993) ("Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *Dillon v. Wilson*, 935 F.2d 269, at *2 (6th Cir. 1991) (stating that director and warden "were entitled to rely on the diagnosis of the treating physician"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987) ("[P]rison officials, after proper investigation, learned of and relied upon the recommendations of the doctors and nurses, as they are entitled to do."); *McCracken v. Jones*, 562

F.2d 22, 24 (10th Cir. 1977) (stating that "defendants were entitled to rely on the diagnosis they received from the state medical authorities who examined plaintiff"); *Brady v. Halawa Corr. Facility Med. Unit Staff*, 2006 WL 2520607, *12 (D. Hawai'i 2006) (stating that the prison warden, who is not a trained doctor or medical professional, is entitled to rely on the medical diagnosis of doctors); *Trahan v. Reinken*, 2006 WL 1169105, at *3 (S.D. Tex. 2006) (stating that warden's "deference to the health care providers was an adequate response to support a finding that he was not deliberately indifferent to [the inmate's] need for medical attention"); *Crockett v. Ozmint*, 2003 WL 24051563, at *5 (D.S.C. 2003) ("Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment."); *Wade v. Angelone*, 2002 WL 32488471, at *4 (E.D. Va. 2002) ("[S]upervisory officials are entitled to rely on the expertise of prison doctors in treating inmates and are not deliberately indifferent in failing to intervene in treatment."); *Waldrop v. Evans*, 681 F. Supp. 840, 848–49 (M.D. Ga. 1998) (holding that prison commissioner and superintendent who were not medical or mental health care professionals "must rely" on the medical decisions of the trained physicians); *Fillebrown v. Zettlemoyer*, 1996 WL 460051, at *3 (E.D. Pa. 1996) ("Since [the] defendants were entitled to rely upon the recommendations of the treating physician, their conduct did not amount to deliberate indifference."); *Ellison v. Scheipe*, 570 F. Supp. 1361, 1363–64 (E.D. Pa. 1983) ("[P]rison officials cannot be required to second guess the medical judgment of the physician."); *Shepard v. Stidham*, 502 F. Supp. 1275, 1281 (M.D. Ala. 1980) (holding that the prison officials had a right to rely on the medical judgment of the physician, and therefore were not deliberately indifferent).  As such, Defendants were allowed to (and indeed, perhaps required to) rely on the medical judgments made by medical professionals responsible for prisoner care—here Dr. Luckey and the emergency room staff at Helen Keller Hospital.  This is especially the case where,

as here, there is no evidence that Defendants, themselves, possessed any type of medical expertise. Therefore, because the court finds it is undisputed that Defendants obtained and heeded medical advice for Mr. Hill, Plaintiff cannot establish two critical facts which are necessary for a finding of deliberate indifference: they cannot show that (1) Defendants possessed the subjective knowledge of a risk of serious harm to Mr. Hill and (2) thereafter disregarded that risk.[5]

Moreover, even if Plaintiff could demonstrate this subjective intent on the part of any Defendant (and he cannot), Plaintiff has not offered any evidence on the remaining two prongs of the deliberate indifference test: there is no evidence that any Defendant disregarded the risk of serious harm to Mr. Hill nor that, even if it could be said such disregard existed, it was in the form of conduct constituting more than gross negligence. Defendants obtained medical treatment on at least three separate occasions to Mr. Hill and followed such medical advice. (Doc. # 6 ¶¶ I-5–I-6, I-20–I-21, I-84, I-87, I-92, I-94–I-96, I-106–I-110, I-113–I-118, I-120, I-122–I-123, I-126–I-130; Doc. # 8 Ex. F; Doc. # 9 Ex. E 37; Doc. # 9 Ex. G 28–30, 42; Doc. # 10 Ex. K; Doc. # 10 Ex. L; Doc. # 10 Ex. M). The undisputed facts relating to Defendants' treatment and monitoring of Mr. Hill,  negate any claim that Defendants disregarded the severity of Mr. Hill's medical needs or that their conduct amounted to more than gross negligence. (*Id.*). Therefore, this court finds that Plaintiff has failed to establish the requisite elements of his deliberate indifference claim against

---

[5]Plaintiff's assertion that Mr. Hill was not given food and water, and, thus, Defendants were deliberately indifferent not only to his medical needs, but also his basic human needs, is undermined by undisputed evidence that he was offered food and water and encouraged to eat and drink continuously throughout his incarceration. (Doc. # 6 ¶¶  I-20, I-84, I-87, I-92, I-94–I-96, I-106–I-110, I-113–I-118, I-120, I-122–I-123, I-126–I-130; Doc. # 8 Ex. F; Doc. # 9 Ex. E 37; Doc. # 9 Ex. G 28–30, 42; Doc. # 10 Ex. K; Doc. # 10 Ex. L; Doc. # 10 Ex. M)

Defendants by providing insufficient evidence to support both the subjective and objective elements of such claim.

    **C.**    **Even if Plaintiff Could State a *Prima Facie* Case of Excessive Force or Deliberate Indifference, Defendants are Entitled to Qualified Immunity.**

"Qualified immunity protects government officials performing discretionary functions from civil trial . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citations omitted).  The purpose of qualified immunity is to allow public officials, including prison officials like Defendants, to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To receive the protections of qualified immunity, Defendants first must show that they were acting within their discretionary duties at the time of the alleged actions in this case. *Lee*, 284 F.3d at 1194.  Eleventh Circuit case law is clear that the burden to make this showing rests with the public official, and that failure to satisfy this burden negates the qualified immunity defense. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (explaining that if defendants cannot meet their burden of showing that they were engaged in a discretionary function, they are ineligible for qualified immunity).  To determine whether an official was engaged in a discretionary function, courts consider whether his acts were of a type that fell within his job responsibilities. *See id.* at 1265.  In making this inquiry, "[courts] ask whether the government employee was (a) pursuing

23

a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.*  Clearly, it was within Defendants' discretion to: (1) arrest and/or detain Mr. Hill; (2) restrain Mr. Hill as a way to prevent his suicide and any harm to others; (3) obtain medical advice as to Mr. Hill; (4) follow such medical advice; (5) otherwise attend to Mr. Hill's needs during his incarceration.  *Lee*, 284 F.3d at 1194 (officer was acting in his discretionary authority when he arrested the plaintiff).  Defendants' "goals" were to incarcerate Mr. Hill, protect him from himself, prevent him from harming others, attend to his medical needs, and ensure the orderly functioning of the jail.

As Plaintiff does not allege that Sheriff May had any direct contact with Mr. Hill during the latter's incarceration, the claims against him must be limited to (1) the alleged negligent hiring and supervision of his staff, which the Plaintiff alleges was the "policy and/or custom" of Sheriff May, and (2) that Sheriff May's policies with respect to inmate medical care and excessive force constituted a violation of Mr. Hill's constitutional rights.  For the purposes of the qualified immunity analysis, it was within Sheriff May's discretion to supervise and train the prison officials employed by the Colbert County Jail, as well as to develop policies for the treatment of inmates.  Thus, supervision of such employees, attending to the needs of inmates, ensuring Mr. Hill's safety and physical well-being, and developing policies and procedures to ensure efficiency and order at the jail were his "goals."  The means used to accomplish these goals—publishing a handbook of policies and procedures, ordering that Mr. Hill be restrained and put on suicide watch, and directing officers to attend to Mr. Hill—were certainly within the Sheriff May's power and duties.  *See Holloman*, 370 F.3d at 1265.  Thus, the first requirement of the qualified immunity inquiry is satisfied as to all Defendants.

After a defendant shows that he acted within his discretionary authority, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. *Lee*, 284 F.3d at 1194. Plaintiff must demonstrate that his allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If no constitutional right was violated, assuming the plaintiff's allegations are true, the court need not inquire further. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, if a constitutional right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established at the time of the alleged violation. *Hope*, 536 at 739.

Consistent with its discussion above, the court concludes that Plaintiff has failed to produce any evidence (much less substantial evidence) that Mr. Hill was in any way subjected to excessive force. Thus, as Plaintiff cannot show any constitutional violation, Defendants are entitled to qualified immunity as to Plaintiff's claims of excessive force.

As already noted, and as it relates to Plaintiff's claims for deliberate indifference, the court concludes that Defendants were permitted (and may have been required) to rely upon the judgment of the medical professionals treating Mr. Hill in attending to his medical needs. *Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."); *see also supra* pp. 19–21. None of these Defendants have any kind of medical education, training, or experience, and none are required, by any applicable law, to have such training. There is ample evidence in the record of Defendants' obtaining such medical treatment for Mr. Hill and following such medical advice with respect to Mr. Hill. (Doc. # 6 ¶¶ I-5–I-6, I-20–I-21, I-84, I-87, I-92, I-94–I-96, I-106–I-110, I-113–I-118, I-120, I-122–I-123, I-126–I-130; Doc. # 8 Ex. F; Doc. # 9 Ex. E 37;

Doc. # 9 Ex. G 28–30, 42; Doc. # 10 Ex. K; Doc. # 10 Ex. L; Doc. # 10 Ex. M).  Therefore, the court concludes that Defendants did not violate Mr. Hill's constitutional rights with respect to the provision of medical care to him.

Moreover, and alternatively, the court finds that Defendants would also be entitled to qualified immunity for a second reason:  the right that Plaintiff seeks to vindicate was not clearly established at the time of the alleged violation.  "[The Eleventh Circuit] undertake[s the qualified immunity] determination in light of the specific context of the case, not as a broad general proposition, in an effort to ensure that before [public officials] are subjected to suit, [they] are on notice their conduct is unlawful." *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1269–70 (11th Cir. 2003) (internal citations omitted; internal quotation marks omitted).  The burden is on Plaintiff to show that Defendants were on notice that their conduct crossed a constitutional barrier, *Hope v. Pelzer*, 536 U.S. 730, 736 (2002), and when such a showing is made it is often (but not always) established by pointing to a pre-existing factually similar case.  *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).  Here, there is not a case (or anything else for that matter) that would place these Defendants on notice that their conduct was unlawful.  Furthermore, there is at least one case in this circuit that would tend to suggest to the reasonable public official that the conduct challenged here was constitutionally appropriate.  *See Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) (holding that supervisory officials are entitled to rely upon the medical judgments of medical professionals who care for prisoners).  Two district court decisions have come to the same conclusion.  *Shepard v. Stidham*, 502 F. Supp. 1275, 1281 (M.D. Ala. 1980); *Waldrop v. Evans*, 681 F. Supp. 840, 848–49 (M.D. Ga. 1998).  Accordingly, the court concludes that there would be "no fair warning" to Defendants that their actions (specifically, relying upon the

judgment of medical professionals with respect to the medical care of inmates) was impermissible for purposes of qualified immunity. *See Wilson v. Jones*, 251 F.3d 1340, 1345–46 (11th Cir. 2001) (holding that where two district courts within the Eleventh Circuit had upheld the Sheriff's policy of blanket strip searches, there was no fair warning that this policy was unlawful for purposes of qualified immunity).

**D.    Plaintiff's Claim that Sheriff May's Policy Regarding Prisoner Consent for Medical Treatment is Unconstitutional is Without Merit.**

Plaintiff has asserted that Sheriff May's policy regarding prisoner consent for medical treatment is unconstitutional.  The policy states that if an inmate refuses to sign a medical authorization form  that no medical services, other than emergency life saving procedures, will be offered.  (Doc. # 20 Ex. AA).  Plaintiff appears to assert that this policy is a way for Defendants to shield themselves from liability while withholding medical treatment.  If that is the argument, the court disagrees.  The policy seeks to preserve the rights of inmates to refuse care they do not want. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (holding the right to refuse medical treatment is a fundamental right); (*see also* Doc. # 20 Ex. BB ¶ 4).  Moreover, Sheriff May's policy provides that inmates who are mentally or physically incapable of signing a form are still entitled to receive necessary medical care.  (Doc. # 20 Ex. BB).  Plaintiff has presented no evidence that this policy caused a violation of Mr. Hill's rights and it is undisputed that he was given medical treatment three times during his five day incarceration.  (Doc. # 6 ¶¶ I-5–I-6, I-20–I-21).  As Plaintiff has not shown the requisite causal connection between the policy and Mr. Hill's treatment, the court determines that policy is irrelevant in determining whether Mr. Hill's rights were violated.

### E.    Plaintiff's Supervisory Claims

Plaintiff's claims against Sheriff May are: (1) that he negligently hired and supervised his staff, which the Plaintiff alleges was the "policy and/or custom" of Sheriff May, and (2) that Sheriff May's policies with respect to inmate medical care and excessive force constituted a violation of Mr. Hill's constitutional rights.  "In establishing liability pursuant to § 1983, however, a prisoner cannot rely on theories of vicarious liability or *respondeat superior*."  *Williams v. Limestone County, Ala.*, 198 F. App'x 893, 896 (11th Cir. 2006) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115–16 (11th Cir. 2005)).  "Section 1983 requires proof of an affirmative causal link between the official's acts or omissions and the alleged constitutional deprivation."  *Williams*, 198 F. App'x at 896 (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)).  Such causal connection may be proven by showing the official "(1) was personally involved in the acts or omissions which resulted in the constitutional deprivation; (2) established a policy or custom that resulted in the constitutional deprivation; or (3) breached a duty imposed by state or local law."  *Id.*  In various cases, the Eleventh Circuit has elaborated on the evidence necessary to establish this causal connection, which includes that evidence tending to show: (1) "a history of widespread abuse put[ting] the responsible supervisor on notice of the need to correct the alleged deprivation, and h[is] fail[ure] to do so," *Braddy v. Florida Dep't of Labor and Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998), (2) the supervisor's improper "custom or policy resulted in deliberate indifference to constitutional rights," *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991), or (3) "the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003).

Thus, failure to adequately supervise and/or train subordinates "constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [subordinates] come into contact.'" *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378 (1989)). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, . . . and when the failure to train is likely to result in the violation of a constitutional right." *Williams*, 198 F. App'x at 896 (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1397–98 (11th Cir. 1994)). "In general, then, a failure to train satisfies the subjective prong of the Eighth Amendment calculus, and imposes supervisory liability on a prison official, where that failure evinces a disregard of the strong likelihood that, absent such training, prison personnel would subject an inmate to 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Williams*, F. App'x at 896 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Plaintiff has not shown that Sheriff May had any personal involvement with Mr. Hill other than ordering that Hill be restrained, and Sheriff May himself has made clear that he had no personal contact with Mr. Hill.  (Doc. # 6 ¶¶ I-63–I-65, I-68–I-69, I-147; Doc. # 8 Ex. E 48, 79–80, 82, 92–93; Doc. # 8 Ex. F).  Additionally, Plaintiff has not presented any evidence to show that Sheriff May knew of or should have known of any widespread abuse or that he had in place any custom or policy that resulted in deliberate indifference by his subordinates.  The only evidence submitted by any party that even arguably relates to this issue are excerpts from the "Colbert County Jail Policy and Procedure Directives" submitted by Defendants, which support the Defendants' motion—they tend to show only that Defendants followed sound policies and procedures and that Sheriff May gave all

29

prison official appropriate training.  (Doc. # 20 Ex. AA; *see also supra* Part IV.D).  Most tellingly, Plaintiff has presented no evidence of any prior abuse, deliberate indifference, or constitutional violations that would have put Sheriff May on notice of a need to correct any problems.

Furthermore, insofar as the court has found that none of the Defendants violated Mr. Hill's constitutional rights, it follows that Plaintiff cannot pursue a claim against Sheriff May for his negligent or wanton hiring or supervision of any Defendant either under § 1983 or a state tort law theory of negligent hiring or supervision.  As the court has concluded that Defendants have not committed any violation of Mr. Hill's rights under the Fourth, Eighth, and Fourteenth Amendments, there is no evidence demonstrating Sheriff May's improper "custom or policy resulted in deliberate indifference to constitutional rights," *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991), or that he "directed [Defendants] to act unlawfully or knew that [they] would act unlawfully and failed to stop them from doing so," *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003).  Therefore, Plaintiff cannot sustain a § 1983 claim against Sheriff May.

Finally, under Alabama law, "a company [or supervisor] cannot be independently guilty of negligent or wanton hiring, training, or supervising in the absence of some tort committed by its  [or his] employee against the plaintiffs." *McKinnes v. Am. Int'l Group, Inc.*, 420 F.Supp.2d 1254, 1259 (M.D. Ala. 2006);  *see also Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003); *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Taylor v. Stevenson*, 820 So. 2d 810, 812 (Ala. 2001).  Because the court has concluded that Defendants did not use excessive force against Mr. Hill and were not deliberately indifferent to his medical needs, there is no actionable tort to support a negligent or wanton hiring or supervision claim.

## V.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. # 3) is due

to be granted.  The court will enter an Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this ___3rd_____ day of April, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE